In the matter of CONDEMNATION BY THE URBAN REDEVELOPMENT AUTHORITY OF PITTSBURGH of Certain Land in the Third Ward of the City of Pittsburgh, Allegheny County, Pennsylvania.

Terrance Arrington and Rhonda
L. Arrington, his wife,
Appellants,

v.

Urban Redevelopment Authority
of the City of Pittsburgh.

Commonwealth Court of Pennsylvania.

Argued Feb. 5, 2003.

Decided April 24, 2003.

Kenneth J. Yarsky, II, Pittsburgh, for appellants.

Joel L. Lennen, Pittsburgh, for appellee.

BEFORE: COLINS, President Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY President Judge COLINS.

Terrance Arrington and Rhonda L. Arrington (condemnees) appeal an Allegheny County Court of Common Pleas (common pleas court) order overruling their preliminary objections to a declaration of taking filed by the Urban Redevelopment Authority of Pittsburgh (Authority). We affirm the order of the common pleas court.

The property owned by the Arringtons that was condemned by the Authority is located on the periphery of the Bedford Redevelopment Project. The Bedford Project is an ongoing development pro-

ject of the Bedford and Middle Hill areas in the City of Pittsburgh. The purpose of the project is to rid the area of blight conditions and open the area to new construction and development. In furtherance of the project the "Crawford–Roberts, Basic Conditions Report" was prepared in October 1972. Pursuant to that report, certain areas were found to be blighted. On November 10, 1972, the City Planning Commission certified the area in question as blighted and certified it as a redevelopment area as defined in Section 3(n) of the Urban Redevelopment Law,[1] 35 P.S. § 1703(n). A designation of blighted will result when the conditions of blight are found, i.e., unsafe, unsanitary and inadequate housing conditions, excessive building coverage, defective design and arrangements of buildings, faulty street and lot layout, and economically and socially undesirable land uses, transient population, and absentee ownership. Additional studies were done, and the findings set forth in the "Extension to Crawford–Roberts—Certified Area Basic Conditions Report" in November 1997 designated an even wider area as blighted. The City Planning Commission prepared a redevelopment plan, and the Authority prepared a redevelopment proposal for the Project and the extension area (the Proposal).

The Proposal recommends that churches and homeowners who have occupied their properties within the last 180 days and whose properties are listed to be acquired will be exempt from acquisition. The Proposal was approved by the Authority Board on June 10, 1999 and by the City Planning Commission on June 15, 1999, whereupon it was submitted to City Council. City Council made the proposal available for public review and held a public hearing. Following that period, on March 21, 2000, the proposal was approved by City Council.

In August 1992, the Arringtons purchased the subject property with loans from the Authority. As a condition of the loans, the Arringtons promised to maintain the property as their principal residence during the course of the loans. However, in January 1998 the Arringtons relocated to Georgia. The Arringtons refused the Authority's offer to buy back the property. The Arringtons' property is located within the extended blight area defined in the November 1997 report. Since the Arringtons' property was non-owner occupied and within the extended blight area, a declaration of taking was filed and secured by a bond. The Arringtons filed preliminary objections to the declaration of taking, asserting that their property was not blighted, that the Authority had no authority to condemn the property, that they had been denied equal protection because of the exemption of certain owner-occupied premises, that the property was being taken for private purposes, that they had been denied due process, and that the bond was insufficient. After submission of deposition testimony and exhibits, the common pleas court overruled the preliminary objections. The court found that the City Planning Commission had acted in good faith in certifying the project area as blighted and that the Authority, in exercising the right of eminent domain in relation to the Arringtons' property, had acted in good faith and followed proper statutory procedures. The Arringtons (Condemnees) have appealed that ruling to this Court.

■ Our scope of review is limited to a determination of whether the trial court's decision evidences an abuse of discretion or an error of law. *In re Condem-*

1. Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §§ 1701–1719.2.

nation by the *Urban Redevelopment Authority*, 117 Pa.Cmwlth. 475, 544 A.2d 87 (1988), *affirmed* 527 Pa. 550, 594 A.2d 1375 (1991). The power of discretion over what areas are to be considered blighted is solely within the power of the Authority. The only function of the courts in this matter is to see that the Authority has not acted in bad faith; to see that the Authority has not acted arbitrarily; to see that the Authority has followed the statutory procedures in making its determination; and finally, to see that the actions of the Authority do not violate any of our constitutional safeguards. *Id.* at 89 (citations omitted.) An Authority's exercise of its discretion should not be disturbed "in the absence of fraud or palpable bad faith." *Oliver v. Clairton,* 374 Pa. 333, 340, 98 A.2d 47, 51 (1953). The six issues asserted by Condemnees are challenges to the trial court's findings that the Authority did not act arbitrarily or in bad faith, and to the finding that the taking was constitutionally sound.

■ We find no merit to the Arringtons' initial contention that the trial court erred in finding that the Arringtons failed to provide factual support for the contention that their property is not currently blighted. Intertwined in this argument, is the Arringtons argument that excluding owner-occupied residences from condemnation violates equal protection rights. A finding that a specific property is blighted is not necessary to support a condemnation proceeding if the property lies within a blighted area. Here, the evidence of record supports the conclusion that the designated area was blighted, and all agree that the property at issue lies within the perimeter of the blighted area. Therefore, a challenge to the taking on this issue has no merit. *Crawford v. Redevelopment Authority of Fayette County,* 418 Pa. 549, 211 A.2d 866 (1965); *Leo Realty Company v.*

*Redevelopment Authority of the City of Wilkes–Barre,* 13 Pa.Cmwlth. 288, 320 A.2d 149, 151 (1974).

■ The mere challenge to the Authority's exclusion of owner-occupied residences from condemnation is an attack on the Authority's certification of blight, which certification the Arringtons did not challenge. Furthermore, the record here reflects that absentee ownership and transient population generally leads to more degraded properties and that owner-occupied properties and churches would help in establishing stability in the area. There is no evidence of involvement of a suspect class or sensitive classification; there is a rational basis for the distinctions, therefore, the challenge that the certification of blight violates equal protection rights is found without merit since there is evidentiary support for the distinction.

Lastly, the Arringtons contend that condemnation was for a private purpose and not a public purpose because the property will be used for private residential development. However, the evidence of record is that the property will be used to eliminate blight and to create a tract of land that can be further development for residential use. The evidence establishes that the property is being taken for a proper public purpose; therefore, it may be permitted to revert to private ownership when the public purpose is discharged. *White v. Redevelopment Authority of County of Washington,* 147 Pa.Cmwlth. 175, 607 A.2d 314 (1992); *In re: Condemnation by the Redevelopment Authority of the City of Harrisburg,* 30 Pa.Cmwlth. 273, 373 A.2d 774, 776 (1977).

Accordingly, the order of the Court of Common Pleas of Allegheny County overruling the preliminary objections of Terrance and Rhonda Arrington is affirmed.

Judge McGINLEY did not participate in the decision of this matter.

## ORDER

AND NOW, this 24th day of April 2003, the order of the Court of Common Pleas of Allegheny County is AFFIRMED.

## DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority opinion because, for the first time, it holds that a property can be taken based on who owns the property rather than on the condition of the property or the necessity of the taking to carry out the redevelopment plan. Under the Urban Redevelopment Law,[1] the ownership status of the property is not a criterion for condemning a property because it is not rationally related to carrying out the redevelopment of an area. Because of the majority's holding, whether a house in tip-top shape is going to be condemned while a deteriorating, dilapidated, trash-strewn property next door will not, will be determined not on valid planning reasons, but solely on the status of the person who owns it, and removing people, not curing blight, is now permissible.

In August 1992, Terrance Arrington and his wife, Rhonda L. Arrington (the Arringtons), purchased property at 1819 Webster Avenue in Pittsburgh, Pennsylvania, and rehabilitated that property in accordance with the requirements of the Urban Redevelopment Authority of the City of Pittsburgh (Authority). The Arringtons now reside in Georgia but maintain the property as a rental property and have rented the property to various relatives. The property is located in an area known as the Bedford Redevelopment Project (Project), an area that was designated as blighted under the Urban Redevelopment Law. In accordance with that Law, the City Planning Commission prepared a re-

development plan (Plan) and the Authority prepared a redevelopment proposal (Proposal) for the Project. As part of the plan, the City Planning Commission stated that blight would be corrected by determining "that properties would be acquired, a number of properties would be demolished, infrastructure improvements would be made and that a[sic] *new rental* and for sale properties would be constructed within that area." (Reproduced Record at 182.) (Emphasis added.) The Proposal recommended that churches and homeowners who had occupied their properties within the last 180 days and whose properties were listed to be acquired would be exempt from acquisition. The Proposal was approved by the Authority, the City Planning Commission and, after a public hearing, by the Pittsburgh City Council.

Because the Arringtons' property was non-owner occupied and within the extended blight area, a declaration of taking was filed. The Arringtons filed preliminary objections arguing, *inter alia,* that their property was not blighted and that they had been denied equal protection because of the exemption of owner-occupied properties. The Court of Common Pleas of Allegheny County (trial court) overruled the preliminary objections, finding that the Authority had acted in good faith and had followed statutory procedures. On appeal, the majority affirms the trial court, because "absentee ownership and transient population generally leads to more degraded properties and that owner-occupied properties and churches would help in establishing stability in the area,". (Slip opinion p. 5.)

While I agree that there is no requirement that a specific property be deemed blighted to be subject to taking to implement a redevelopment plan, I dissent because there is no valid reason to exclude a

1. Act of May 24, 1945, P.L. 991, *as amended,*    35 P.S. §§ 1701–1719.2.

property from a plan that is not based on planning considerations. If the determination is based upon who owns the property, there is no overall plan to cure blight as required by the Urban Redevelopment Law. Instead, the exact opposite occurs a Swiss cheese plan where a property is included or excluded not based on blight or on any rational planning reason, but merely based upon who owns the property.

The Urban Development Law sets forth the procedure by which an area is redeveloped. It starts off with an area being designated as blighted, an area redevelopment plan being prepared by the City Planning Commission, and a redevelopment proposal being prepared by the Authority, all of which are approved by the City Council. The criteria to be used to determine whether an area is blighted is set forth in Section 2 of the Urban Redevelopment Law, 35 P.S. § 1702. Under that provision, an area can be designated as blighted when it exhibits the following:

(a) That there exist in urban communities in this Commonwealth areas which have become blighted because of the unsafe, unsanitary, inadequate or overcrowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or economically or socially undesirable land uses.

(b) That such conditions or a combination of some or all of them have and will continue to result in making such areas economic or social liabilities, harmful to the social and economic well-being of the entire communities in which they exist, depreciating values therein, reducing tax revenues, and thereby depreciating further the general community-wide values.

* * *

(e) That there exist within the Commonwealth both within and outside of certified redevelopment areas, properties which have become derelict, abandoned or unfit for human habitation or other use by reasons of age, obsolescence, prolonged vacancy, dilapidation, deterioration, lack of maintenance and care or general neglect.

(f) That such derelict properties individually and collectively constitute a blight and nuisance in the neighborhood; create fire and health hazards; are used for immoral and criminal purposes; constitute unreasonable interferences with the reasonable and lawful use and enjoyment of other premises in the neighborhood; are harmful to the social and economic well-being of any municipality; depreciate property values; and generally jeopardize the health, safety and welfare of the public.

35 P.S. § 1702.

As can be seen, all of the factors used in determining blight relate to the physical condition of the property, not to the status of the person who owns the property. Under the majority opinion, though, due to the transient nature of the persons that rent properties, those properties become undesirable because they lead to more degraded properties; therefore, owner-occupied properties and churches would help in establishing stability in the area. Under that reasoning, however, brand new apartment complexes could be considered a blighted area merely because they are not owner-occupied. Because blight is determined by the physical characteristics of the area to be certified, the fact that a property owner rents his property in no way establishes that an area is blighted or that the area is unsafe, unsanitary, inadequate, over-crowded, lacking proper light

and air and open space, is harmful to the well-being of the entire community, depreciates values, is derelict, abandoned, unfit for human habitation, creates fire and health hazards, is used for immoral and criminal purposes and is harmful to the well-being of the municipality.[2]

After an area is determined to be blighted, the procedure to be used to redevelop the property is set forth in Section 10 of the Urban Redevelopment Law, 35 P.S. § 1710, which provides:

(a) An Authority shall prepare a redevelopment proposal for all or part of any area certified by the planning commission to be a redevelopment area and for which the planning commission has made a redevelopment area plan.

(b) The planning commission's certification of a redevelopment area shall be made in conformance with its comprehensive general plan (which may include, inter alia, a plan of major traffic arteries and terminals and a land use plan and projected population densities) for the territory under its jurisdiction or for any greater area for which the field of operation of the Authority has been extended under clause (e) of section 3 of this act.

(c) The planning commission's redevelopment area plan shall include, without being limited to, the following:

(1) The boundaries of the area, with a map showing the existing uses of the real property therein;

(2) A land use plan of the area showing proposed uses following redevelopment;

(3) Standards of population densities, land coverage and building intensities in the proposed redevelopment;

(4) A preliminary site plan of the area;

(5) A statement of the proposed changes, if any, in zoning ordinances or maps;

(6) A statement of any proposed changes in street layouts, street levels, and proposed traffic regulation, including the separation or excluding of vehicular traffic partially or totally from pedestrian traffic;

(7) A statement of the extent and effect of the rehousing of families which may be made necessary from the redevelopment area plan, and the manner in which such rehousing may be accomplished;

(8) A statement of the estimated cost of acquisition of the redevelopment area, and of all other costs necessary to prepare the area for redevelopment;

(9) A statement of such continuing controls as may be deemed necessary to effectuate the purposes of this act.

(d) In conformity with such redevelopment area plan, the Authority shall prepare a proposal for the redevelopment of all or part of such area. The Authority may, if it deems it desirable, hold public hearings prior to its final determination of the redevelopment proposal.

(e) The Authority shall submit the redevelopment proposal to the planning commission for review. The planning commission shall, within forty-five days, certify to the governing body its recommendation on the redevelopment proposal, either of approval, rejection or modification, and in the latter event, specify the changes recommended.

(f) Upon receipt of the planning commission's recommendation, or at the ex-

---

**2.** It is ironic that the Plan proposes to construct a high density apartment complex in the blighted area.

piration of forty-five days, if no recommendation is made by the planning commission, the Authority shall submit to the governing body the redevelopment proposal with the recommendation, if any, of the planning commission thereon.

\* \* \*

(i) Upon approval by the governing body of the redevelopment proposal, as submitted by the Authority, the Authority is authorized to take such action as may be necessary to carry it out.

Again, as can be seen, what the redevelopment plan is concerned with is the physical characteristics of the property. And again, nothing in this provision authorizes a redevelopment plan that allows the taking of property based on the status of who owns the property; instead, it focuses only on what property needs to be taken to effectuate the plan and cure blight which has nothing to do with a property owner's status. Accordingly, because nothing in the Urban Redevelopment Law provides that property can be taken based on the status of the owner, I would reverse the trial court's order and grant the Arringtons' preliminary objections.[3]

Judge FRIEDMAN joins.

---

3. Even if the Urban Redevelopment Law provided that rental properties could be taken, I would strike it down as unconstitutional as violating equal protection because no rational reason exists for the distinction between owner-occupied and rental property.