**REDEVELOPMENT AUTHORITY
OF the CITY OF YORK**

v.

**Dusan BRATIC, Appellant.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 23, 2012.

Decided May 10, 2012.

Stephen K. Portko, Dillsburg, for appellant.

Donald B. Hoyt, York, for appellee.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and COLINS, Senior Judge.

OPINION BY Senior Judge COLINS.

Dusan Bratic (Condemnee) appeals the August 4, 2011 order of the York County Court of Common Pleas (trial court) overruling his preliminary objections to a declaration of taking filed by the Redevelopment Authority of the City of York (Condemnor). We affirm the order of the trial court.

In eminent domain proceedings, preliminary objections are the exclusive means by which a condemnation may be challenged, and are limited to: (i) the power or right of the condemnor to appropriate the condemned property unless it has been previously adjudicated; (ii) the sufficiency of security; (iii) the declaration of taking; and (iv) any other procedure followed by the condemnor. Act of May 5, 2006, P.L. 112, § 1, 26 Pa.C.S. § 306(a)(3). In the case before us, Condemnee objects neither to the sufficiency of the security, nor the declaration of taking; instead, the objections raised by Condemnee go to the procedure by which the Condemnor effected condemnation and the power of the Condemnor to do so. Because Condemnee's objections rely almost entirely on fact, we will first address the detailed background put forth, and then proceed to a discussion of Condemnee's objections.

### Background

On November 4, 2009, Condemnee was issued a Notice of Unsafe Structure letter (Notice 1) from the City of York (City) concerning the property located at 43–45 West Market Street in the City of York, York County, Pennsylvania (Property). (Notice 1, R.R. at 369a.) Notice 1 informed Condemnee, *inter alia,* that the building was designated an Unsafe Structure, Blighted Property, and Premises Unfit for Human Habitation, and that Condemnee had 15 days to respond in writing to the Bureau of Permits, Planning and Zoning

(Bureau) stating his acceptance or rejection of the designation, as well as 30 days to appeal the determination to the Board of Appeals. (*Id.*) Notice 1 also informed Condemnee that if he failed to correct the deficiencies affecting the Property, he risked condemnation. (*Id.*) Condemnee responded in person on November 25, 2009, at the office of Jack Sands, the Bureau building code official who had authored Notice 1, and by letter dated the same day addressed to Mr. Sands, which stated:

> Please accept this letter as confirmation of my discussion with you concerning the above referenced property. We hereby object to the classification of the property as unsafe for human habitation. As discussed, we intend to make the roof repairs as requested in your letter as well as stabilize the rear west wall.

(Letter from Appellant to Building Code Official Jack Sands at 1, R.R. at 136a; February 3, 2011 Appellant Affidavit (Appellant Affidavit) at 2, R.R. at 248a; January 10, 2011 Deposition of Jack Sands (Sands Dep.) at 9–11, R.R. at 422a–424a.) Condemnee did not appeal the determination in Notice 1 to the Board of Appeals within the 30 days provided. (November 22, 2010 Deposition of Kevin Schreiber (Schreiber Dep.) at 9, R.R. at 320a.)

On February 17, 2010, a second Notice of Unsafe Structure (Notice 2) letter was sent to Condemnee. (Notice 2, R.R. at 372a.) Condemnee responded to Notice 2 by leaving a voicemail message for Mr. Sands advising that he would make repairs when the weather turned. (Sands Dep. at 15, R.R. at 428a; March 24, 2010, 8:56 a.m. Email from Jack Sands to Melinda McGee, R.R. at 446a.) Condemnee did not respond in writing to the Bureau within the 15 days provided or seek an appeal with the City Board of Appeals within the 30 days allowed. (Schreiber Dep. at 10, R.R. at 321a.)

On March 2, 2010, an inquiry made by the City to the York County Tax Claim Bureau revealed that the Property was delinquent on taxes owed to the county, municipality, and school district for the years 2008 and 2009. (York County Tax Claim Listings for 2010, R.R. at 281a.)

On April 14, 2010, Condemnee contacted Mr. Sands by telephone and informed him that remediation of the Property would begin in two weeks. (Appellant Affidavit at 2, R.R. at 248a; April 14, 2010, 3:04 p.m. Email from Jack Sands to Robert Behler et al., R.R. at 448a.) In response to an earlier inquiry, the City Housing Programs Coordinator received a letter on April 20, 2010, from the York Water Company that detailed the activity status for a list of properties; this list included the Property, which was reported as having an inactive water supply dating from July 24, 2004. (Letter from York Water Co. to Melinda McGee City Housing Programs Coordinator, R.R. at 380a.) On April 22, 2010, a Notice of Blighted Property was sent to Condemnee by certified mail and posted. (Notice of Blighted Property, R.R. at 375a; Picture of Posted Notice of Blighted Property, R.R. at 378a; U.S. Postal Service Certified Mail Delivery Record, R.R. at 379a.) The Notice of Blighted Property, *inter alia*, outlined the criteria by which the Property had been determined to be blighted, informed Condemnee of a 30–day time period within which he was required to correct the deficiencies or face condemnation, and alerted Condemnee to his right to appeal within 10 days to the Nuisance Abatement Board of Appeals. (Notice of Blighted Property, R.R. at 375a.) Condemnee again did not appeal. (Schreiber Dep. at 13, R.R. at 324a.) On April 28 and 30, 2010, the City Engineers, C.S. Davidson, Inc. (Engi-

neers), visited the Property, conducted a structural assessment, and determined the final list of repairs. (Schreiber Dep. at 18, R.R. at 329a; Sands Dep. at 19, R.R. at 432a; Engineers Report 1, R.R. at 449a.) Condemnee joined the Engineers on their second day at the Property to discuss the wall stabilization needed in the basement. (Appellant Affidavit at 3, R.R. at 249a.) The major concern expressed by the City and the Engineers was that the Property needed to be stabilized before repairs could begin. (Appellant Affidavit at 3, R.R. at 249a; Appellant and Engineers Contract Agreement, R.R. at 270a; Sands Dep. at 19, R.R. at 432a; Engineers Report 1, R.R. at 449a.) The Engineers issued a report on May 4, 2010, detailing the recommended stabilization and remediation necessary for the Property. (Engineers Report 1, R.R. at 449a.)

Beginning in the final days of April 2010, Condemnee took steps to stabilize the Property. (Appellant Affidavit at 2–5, R.R. at 248a–251a.) Condemnee hired the Engineers used by the City and executed a May 20, 2010 contract with them that described the scope of services as: "[d]esign required foundation for new wall proposed in C.S. Davidson's prior report to the City based on actual conditions uncovered by the [Condemnee]." (Appellant and Engineers Contract Agreement, R.R. at 270a.)

On June 14, 2010, the appeal and remediation periods having passed, the Property was certified as blighted by the City Planning Commission. (City Planning Commission Meeting Minutes, R.R. at 406a–407a.) The following day, June 15, 2010, the Property was taken up by the City Council Vacant Property Review Committee, which upheld the designation of the Property as blighted. (City Council Vacant Property Review Committee Meeting Agenda, R.R. at 408a.) Next, on June 16, 2010, the Condemnor certified the Property as blighted and authorized the filing of a Declaration of Taking. (City Redevelopment Authority Meeting Minutes, R.R. at 411a.) On June 17, 2010, Condemnee applied to the City for a permit in order to proceed with the remediation of the Property. (City Construction Permit Application, R.R. at 141a.) The permit request was forwarded, on the same day, to the City Historical Architectural Review Board (HARB) for approval. (*Id.*)

Less than a month later, on July 15, 2010, the Condemnor filed the first Declaration of Taking with the York County Court of Common Pleas. (R.R. at 506a.) The Declaration of Taking was sent via certified mail to what was believed to be Condemnee's home address, but service was not achieved within the 30–day window. (Schreiber Dep. at 24, R.R. at 335a.) On July 22, 2010, HARB sent a letter to Condemnee that confirmed they were recommending approval of the permit application, that detailed the specific requirements imposed because of the Property's historic status, and that informed Condemnee the permit would be available at the Bureau following City Council approval on August 17, 2010. (Letter from HARB to Appellant, R.R. at 143a.)

At the request of the City, the Engineers again performed a site visit to the Property on August 9, 2010. (Engineers Report 2, R.R. at 104a.) The Engineers issued a report that recounted the continued deterioration of the property and significant movement in the severely out of plumb west wall. (Engineers Report 2, R.R. at 105a.) The report also stated that shoring had been done to the first and second floor framing since their visit in late April. (*Id.*) On August 17, 2010, the Declaration of Taking was reinstated by the Condemnor and this second Declaration of Taking was sent by regular mail to what was still believed to be Condemnee's

home address. (Schreiber Dept. at 24, R.R. at 335a; September 3, 2010 Return of Service, R.R. at 497a.) Six days later, on August 23, 2010, Condemnee was issued his building permit. (City Construction Permit Application, R.R. at 141a.)

Due to the prior service issues, the City authorized the retention of a process server and, on September 3, 2010, Condemnee was served in person at his business address with the reinstated Declaration of Taking. (September 3, 2010 Return of Service, R.R. at 145a; Schreiber Dep. at 24, R.R. at 335a.) On September 21, 2010, Condemnee went to the Tax Claim Bureau of York and paid the delinquent taxes on the Property. (Tax Claim Bureau of York Receipt, R.R. at 178a.) The Condemnor filed a Petition for Appointment of Board of View on September 30, 2010. Condemnee then, on October 1, 2010, filed Preliminary Objections. The Condemnor withdrew its Petition for Appointment of Board of View on October 7, 2010.

From January to July of 2011 Condemnee and the Condemnor filed a variety of affidavits, motions, and briefs. Condemnee filed Amended Preliminary Objections on May 3, 2011. This matter was assigned to the trial court for a one-Judge disposition on July 6, 2011, and an opinion and order were issued August 4, 2011, overruling Condemnee's preliminary objections. An appeal to this Court followed.

### Discussion

■ In a review of a decision to condemn property and of the extent of the taking, the trial court's scope is limited to determining whether the condemnor is guilty of fraud, bad faith, or an abuse of discretion. *Downingtown Area School District v. Di Francesco,* 125 Pa.Cmwlth. 264, 557 A.2d 819, 821 (1989). This Court's scope of review is limited to a determination of whether the trial court's

decision evidences an abuse of discretion or an error of law. *In re Condemnation of Urban Redevelopment Authority of Pittsburgh,* 822 A.2d 135, 138 (Pa.Cmwlth.2003). The exercise of discretion over a determination that a property is blighted is solely within the power of the Authority, here Condemnor, and as we have explained:

> The only function of the courts in this matter is to see that the Authority has not acted in bad faith; to see that the Authority has not acted arbitrarily; to see that the Authority has followed the statutory procedures in making its determination; and finally, to see that the actions of the Authority do not violate any of our constitutional safeguards ... An authority's exercise of its discretion should not be disturbed 'in the absence of fraud or palpable bad faith.'

*Id.* (internal citations omitted.) Furthermore, the burden of proving fraud, bad faith, or an abuse of discretion is a heavy burden and it is carried by the objector. *Simco Stores, Inc. v. Redevelopment Authority of the City of Philadelphia,* 8 Pa. Cmwlth. 374, 302 A.2d 907, 913 (1973); *Downingtown Area School District,* 557 A.2d at 821.

Condemnee's first three objections are to the procedure by which Condemnor effected condemnation: Objection I challenges the time period allowed a property owner to remediate following receipt of a Notice of Blight, but prior to the filing of a Declaration of taking; Objection II asserts that Condemnee was led in bad faith to rely upon the misrepresentations of a City building code official, forgoing his right to appeal to his detriment; and Objection III contends that the City Blight Committee, City Planning Commission, and Condemnor were in bad faith provided with inaccurate information concerning Condemnee's efforts to remediate.

*Objection I*

 Condemnee posits that the procedure established in the Notice of Blighted Property creates two possible avenues of action: remediation or appeal. If remediation is chosen, under Condemnee's theory, Section 12.1(e)(2) and (3) of the Urban Redevelopment Law (URL)[1] require that, if a property owner is complying with the order of the responsible department to correct deficiencies, the owner must be given the amount of time necessary to complete the repairs specific to the property being condemned. By limiting the remediation time to 30 days, the length of time allowed for an appeal, Condemnee asserts that Condemnor has acted in bad faith and contravened the statute.

Although the language in Subsection (e)(3) prevents a property from being certified as blighted until the time period for an appeal has expired where, as in this case, no appeal has been taken, the language does not identify a set time period within which remediation efforts need to be completed to prevent condemnation. Section 12.1(e)(2) and (3) state:

> (2) No property shall be certified to the Redevelopment Authority unless the owner of the property or an agent designated by him for receipt of service of notices within the municipality has been served with notice of the determination that the property is blighted, together with an appropriate order to eliminate the conditions causing the blight and notification that failure to do so may render the property subject to condemnation under this act . . .
>
> (3) No blighted property shall be certified to the Redevelopment Authority until the time period for appeal has expired and no appeal has been taken, or, if taken, the appeal has been disposed of,

and the owner or his agent has failed to comply with the order of the responsible department or other officer or agency.

35 P.S. § 1712.1(e)(2), (3). Condemnee reads the language in subsection (e)(2), "an appropriate order to eliminate the conditions causing the blight," and in (e)(3), "and the owner or his agent has failed to comply with the order of the responsible department or other officer or agent," to require the Condemnor to allow a condemnee reasonable, property-specific time to eliminate the conditions noted in the Notice of Blight in cooperation with the responsible City department. (Appellant's Br. at 18.) This reading fails to account for the fact that the statute's silence does not indicate an omission. Here, the legislature enacted a detailed scheme to delegate power to local government authorities to address blight in their communities. 35 P.S. § 1712.1(a). The legislature established specific procedures and safeguards to govern how this power is exercised, but also endowed the authorities with the discretion to establish their own procedures and safeguards within those bounds. *Id.*

We have stated that a Redevelopment Authority like Condemnor is under no obligation to provide owners of blighted properties an opportunity to remediate. *In re Condemnation by Urban Redevelopment Auth.*, 117 Pa.Cmwlth. 475, 544 A.2d 87, 91 (1988). In *In re Condemnation by the Redevelopment Authority of the City of Lancaster*, this Court overruled an objection to a condemnation schedule similar to the schedule at issue here, where a condemnee also objected to the 30–day appeal period determining the speed at which condemnation proceedings could progress. 682 A.2d 1369 (Pa.Cmwlth.1996), *appeal denied*, 547 Pa. 758, 692 A.2d 567 (1997).

---

**1.** Act of May 24, 1945. P.L. 991, *as amended,* 35 P.S. §§ 1701–1719.2, Section 12.1 added by Section 2 of the Act of June 23, 1978, P.L. 556, *as amended,* 35 P.S. § 1712.1.

The URL leaves the determination of the time period allowed for remediation within the discretion of the Condemnor and we find no abuse, bad faith, or error in the Condemnor's exercise of that discretion to determine whether or within what time period a condemnee is allowed to effect remediation following a notice of blighted property.

### Objection II

Condemnee's next objection builds on his previous argument that the condemnation should not have gone forward while he was remediating the property. He asserts that Condemnor acted in bad faith, because, in reliance on representations by a Bureau building code official, Condemnee chose to forgo his appeal in favor of remediation.

As recounted above, Condemnee received two Notices of Unsafe Structure, Notice 1 in November 2009 and Notice 2 February of 2010. (Notice 1, R.R. at 369a; Notice 2, R.R. at 372a.) Each of these letters detailed that the Property was being deemed " 'an unsafe structure, blighted, and unfit for human habitation' and in 'imminent danger of failure or collapse' ", that Condemnee had 15 days to accept or reject the designation in writing to the Bureau, and that Condemnee had 30 days to appeal the Notice to the Appeals Board. (Id.) Each of these letters further advised Condemnee of the state and local laws that governed the Notice of Unsafe Structure action, Condemnee's options going forward, and that failure to eliminate the identified problems "may render the property subject to condemnation ..." (Id.) In each instance, Condemnee chose not to pursue an appeal, but instead contacted the Bureau and expressed his intent to remediate the Property. (Letter from Appellant to Building Code Official Jack Sands at 1, R.R. at 136a; Appellant Affidavit at 2, R.R. at 248a; Schreiber Dep. at 9,

R.R. at 320a; Sands Dep. at 9–11, 16, R.R. at 422a–424a, 428a; March 24, 2010, 8:56 a.m. Email from Jack Sands to Melinda McGee, R.R. at 446a.) Condemnee's intent, however, did not translate into action and on April 22, 2010, a Notice of Blighted Property letter was sent to Condemnee by certified mail and posted. (Notice of Blighted Property, R.R. at 375a; Picture of Posted Notice of Blighted Property, R.R. at 378a; U.S. Postal Service Certified Mail Delivery Record, R.R. at 379a.)

Similar to the Notice of Unsafe Structure letters, the Notice of Blighted Property informed Condemnee that the Property was determined to be blighted, explained the criteria by which the determination was made, and identified the state and local law governing the determination. (Notice of Blighted Property, R.R. at 375a.) In addition, the Notice of Blighted Property alerted Condemnee that he had 10 days to appeal to the Nuisance Abatement Board and 30 days to correct the deficiencies with the Property, or the Property would be forwarded to Condemnor for condemnation proceedings. (Id.) In contrast to the Notices of Unsafe Structure, the Notice of Blighted Property did not ask Condemnee to contact the Bureau to accept or reject the designation. (Notice 1, R.R. at 369a; Notice 2, R.R. at 372a; Notice of Blight, R.R. at 375a.) The Notice was clear: fix the Property within 30 days or appeal within 10. (Notice of Blight, R.R. at 375a.) Condemnee did neither (Schreiber Dep. at 13, R.R. at 324a.)

Condemnee attempts to rebut this overwhelming evidence of notice with a letter that Condemnee drafted in November 2010 for the signature of Mr. Sands, who had left his position with the Bureau on July 1, 2010. (Sands Dep. at 5–6, R.R. at 418a–419a.) The letter states:

After receiving the April 22, 2010 notice of blighted property, [Condemnee] did ask me what he should do with regard to the blight notice in order to correct the situation and avoid further problems with the City. I told him that he needed to stay in touch with my office and to work with us to remediate the problem, which he agreed to do and which I felt like he was doing. He did ask me if he needed to talk to anybody else or do anything else about the blight notice and I told him that as long as he was remediating the problems that's all he needed to do.

(December 14, 2010 Letter from Jack Sands at 1, R.R. at 187a.) In his deposition, Mr. Sands explained that although he made edits to this letter, it was authored by Condemnee well after Mr. Sands had ceased to be employed by the Bureau. (Sands Dep. at 4–6, R.R. at 417a–419a.) Mr. Sands, notwithstanding the statements in the letter, testified under oath that he had not been aware of the Notice of Blighted Property, which had been authored and signed by a different City official, because the blight process was outside of his function as a Bureau building code official. (Sands Dep. at 20–21, R.R. at 433a–434a.) Mr. Sands further testified that his only concern was that the building did not fall down and that he would not have been in a position to advise Condemnee about what to do once Condemnee had received a Notice of Blighted Property. (Sands Dep. at 21, R.R. at 434a.) Finally, Mr. Sands identified a series of emails written by him and sent to various City officials in February, March and April 2010 that documented Condemnee's failure to comply with the Notices of Unsafe Structure. (February 17, 2010, 2:02 p.m. Email from Jack Sands to Deputy Chief Dept. Fire/Rescue Services, R.R. at 445a; March 24, 2010, 8:56 a.m. Email from Jack Sands to Melinda McGee, R.R. at 446a;

April 6, 2010, 1:35 p.m. Email from Jack Sands to Neil Mahoney, R.R. at 447a; April 14, 2010, 3:04 p.m. Email from Jack Sands to Robert Behler et al., R.R. at 448a.)

Given the testimony and documentation provided at Mr. Sands' deposition, and the clear unequivocal instructions provided in the Notice of Blighted Property, we find no error or abuse of discretion on the part of the trial court in its refusal to find the Sands letter evidenced fraud or bad faith on the part of the Condemnor. Furthermore, even if the trial court had credited the Sands letter in the face of the overwhelming evidence that Condemnee was clearly advised of the condemnation procedure and his rights, Condemnee's argument would still fail. Condemnee never offered evidence of actual remediation of the Property; Condemnee cannot object that Condemnor led him in bad faith to remediate instead of appealing, when in fact he never remediated.

### Objection III

■ Condemnee's next objection to the condemnation process is that the City Blight Committee, the City Planning Commission, and the Condemnor were provided with inaccurate information concerning Condemnee's effort to remediate, evidencing bad faith. Condemnee, however, fails to offer any evidence that he did remediate. Instead, Condemnee offers evidence that he pursued his own course of action, parallel to the condemnation process, following his receipt of the Notice of Blighted Property, without ever participating in or availing himself of the process.

The Notice of Blighted Property was sent to Condemnee by certified mail and posted on April 22, 2010. (Notice of Blighted Property, R.R. at 375a; Picture of Posted Notice of Blighted Property, R.R. at 378a; U.S. Postal Service Certified

Mail Delivery Record, R.R. at 379a.) The following week, Condemnee took his first steps to stabilize the property. (Appellant Affidavit at 2–5, R.R. at 248a–251a.) However, Condemnee did not apply for a building permit or HARB approval until after the City Blight Committee, the City Planning Commission, and the Condemnor had already certified the property as blighted and the Condemnor had recommended condemnation. (City Construction Permit Application, R.R. at 141a.) Condemnee did not appear at any of the three public meetings that took place as part of the condemnation procedure and failed to offer any evidence to counter the recommendation of condemnation. (Public Notice of City Planning Commission Meeting, R.R. at 394a; City Planning Commission Meeting Minutes, R.R. at 406a–407a; City Council Vacant Property Review Committee Meeting Agenda, R.R. at 408a; City Redevelopment Authority Meeting Minutes, R.R. at 411a.) The record shows that as late as August 9, 2010, the building was still not properly stabilized. (Engineers Report 2, R.R. at 104a–105a.)

One of the criteria used to determine that the property was blighted was that the property was "[a]n unoccupied property which has been tax delinquent for two years." (Notice of Blighted Property, R.R. at 376a.) In the Notice of Blighted Property, Condemnee was advised that one of the deficiencies that must be corrected within 30 days to avoid condemnation was the delinquent taxes, which were required to be paid as well as documented as paid with the City Bureau of Housing Services. (*Id.*) Condemnee did not pay the delinquent taxes until September 21, 2010, after he had been served with notice of the Declaration of Taking on September 3. (September 3, 2010 Return of Service, R.R. at 145a; Tax Claim Bureau of York Receipt, 178a; Schreiber Dep. at 24, R.R. at 335a.) Condemnee has never submitted evidence to show that the payment was documented with the City Bureau of Housing Services.

Condemnee has failed to demonstrate that the information provided to the City Blight Committee, the City Planning Commission, and the Condemnor was inaccurate or in bad faith.

The final two objections seek to challenge the power of the Condemnor to effect condemnation: Objection IV challenges the characterization of the property as "vacant" within the meaning of the URL, and Objection V challenges the constitutional and statutory authority of Condemnor to use delinquent property taxes as criteria in determining whether or not a property is blighted.

### Objection IV

■ Condemnee argues that the Property was not vacant within the meaning of 35 P.S. § 1712.1 and, as a result, the Property should not have been certified as blighted. Section 12.1(e)(1) provides:

(e) the blighted property review committee and the appropriate planning commission, upon making a determination that any property is blighted within the terms of this section, must certify said blighted property to the Redevelopment Authority, except that:

(1) No property shall be certified to the Redevelopment Authority unless it is vacant. *A property shall be considered vacant if:*

(i) *the property is unoccupied or its occupancy has not been authorized by the owner of the property;*

(ii) *in the case of an unimproved lot or parcel of ground,* a lien for the cost of demolition of any structure located on the property remains unpaid for a period of six months; or

(iii) *in the case of an unimproved lot or parcel of ground,* the property has remained in violation of any provision of the local building, property maintenance or related codes applicable to such lots or parcels, including licensing requirements, for a period of six months.

(emphasis added). In Condemnee's view, the Property does not fall within the confines of the statute, because the parking lot located behind the building was utilized pursuant to a rental agreement between Condemnee and two electrical contractors. (January 29, 2010 Letter from Walton & Co. to Appellant, R.R. at 281a.) The statute, Condemnee asserts, does not state that a building on a property must be occupied for the property as a whole to be occupied. In support of this argument, Condemnee parses two definitions of "vacant", one found in a regular usage dictionary and another discovered in a legal dictionary. (Appellant's Brief at 24.)

Condemnee's reliance is misplaced; there is no need to go searching for a definition of "vacant" when it is provided in the statute. Parts (i) through (iii) in Subsection (e)(1) of the statute clearly differentiate between property that has a structure, such as the commercial building located on the Property at issue here, and properties that do not; both can fall within the definition of "vacant", but an "unimproved lot or parcel" is addressed separately from properties where occupancy is a factor. 35 P.S. § 1712.1(e)(1)(i)-(iii).

The interpretation advocated by Condemnee would transform "vacant" into a synonym of "unused," a conclusion that is undermined both by the text of Subsection (e)(1) and by looking at the other subsections within Section 12.1. For example, Subsection (c) states that "Blighted property shall include: ... (2) Any premises which because of physical condition, use or occupancy is considered an attractive nuisance to children ..." 35 P.S. § 1712.1(c)(2). It is unreasonable to conclude that the General Assembly would differentiate between use and occupancy in one subsection of a statute's provisions, only to conflate them in another. Similarly, we cannot conclude that the General Assembly would redefine a word in ordinary usage without acknowledgment when Pennsylvania rules of statutory construction require words to be construed according to their common and approved usage. *See* Statutory Construction Act of December 6, 1972, P.L. 1339, *as amended,* 1 Pa.C.S. § 1903.

Furthermore, when Section 12.1 is viewed as a whole, it is clear that the legislature's intent is to provide municipal redevelopment authorities with the power to address properties where physical conditions create blight. If we were to accept the definition of vacant put forth by Condemnee, the power of municipal redevelopment authorities to address blight where a property contained a building would be severely limited, reaching only those properties where even the smallest corner goes unused. Such a reading would fundamentally undermine the clear intention of our General Assembly to provide local communities with the tools to deal with dangers, both physical and economic, that accompany the creeping hand of blight. Section 2 of the URL, 35 P.S. § 1702; *Schenck v. City of Pittsburgh,* 364 Pa. 31, 37–38, 70 A.2d 612, 615 (1950); *See also* 1 Pa.C.S. § 1921(a)("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly ..."); *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945) (L. Hand, J.) ("But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have

some purpose or object to accomplish ...").

Accordingly, Condemnor did not contravene the URL when it determined that the Property was vacant within the meaning of Section 12.1, and the lower court did not commit an error of law or abuse its discretion in finding that Condemnee failed to prove Condemnor's determination evidenced fraud, bad faith, or an abuse of discretion.

### Objection V

 Condemnee's last objection is to the constitutionality of Section 12.1(c)(7) of the URL, which mandates that blighted property shall include: "Any unoccupied property which has been tax delinquent for a period of two years prior to the effective date of this act, and those in the future having a two year tax delinquency."[2] Condemnee also contends that this section contradicts "real estate tax laws." (Appellant's Brief at 25.)

 Condemnee does not specify whether his constitutional challenge is rooted in the Pennsylvania Constitution, the United States Constitution, or both; he does not cite to provisions of either constitution; and he does not identify any specific "real estate tax laws" that Section 12.1(c)(7) contradicts. (Appellant's Brief at 25, Appellant's Reply Brief at 10.) It is axiomatic that legislation properly enacted by the General Assembly enjoys a strong presumption of constitutionality and any party challenging a statute's constitutionality bears a heavy burden to demonstrate that the legislation clearly, palpably, and plainly violates the terms of the constitution. *See* 1 Pa.C.S. § 1922(3); *Harrisburg Sch. Dist. v. Zogby,* 574 Pa. 121, 136, 828 A.2d 1079, 1088 (2003); *see also Adelphia Cablevision Assocs. of Radnor, L.P. v. University City Hous. Co.,* 755 A.2d 703, 710 (Pa.Super.2000). Condemnee has not met this burden.

### Conclusion

For the aforementioned reasons, we affirm the determination of the trial court that Condemnee has failed to meet his burden of showing that the Condemnor is guilty of fraud, bad faith, or has committed an abuse of discretion. In addition, we find that the Condemnee has failed to demonstrate that Condemnor's actions were in violation of statutory or state and federal constitutional safeguards. Therefore, we hold that the trial court correctly overruled Condemnee's preliminary objections.

### *ORDER*

AND NOW, this 10th day of May, 2012, the August 4, 2011 order of the York County Court of Common pleas overruling Dusan Bratic's preliminary objections is AFFIRMED.

---

**2.** This subsection is one of several criteria enumerated in Section 12.1 that is used to determine whether an individual property located outside a designated redevelopment area may be deemed blighted. *In re Condem-* *nation by the Redevelopment Auth. of Lawrence County,* 962 A.2d 1257, 1261–1262 (Pa. Cmwlth.2008), *appeal denied,* 601 Pa. 705, 973 A.2d 1008 (2009).